IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: LTC HOLDINGS, INC., et al., | ) | Chapter 7 |
| | ) | Bankr. No. 14-11111 (CSS) |
| Debtors. | ) | Adv. No. 15-51889 (CSS) |
| | ) | |
| INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, | ) ) | |
| | ) | |
| Appellant, | ) | |
| | ) | C.A. No. 19-327 (MN) |
| v. | ) | |
| | ) | |
| ALFRED THOMAS GIULIANO, CHAPTER 7 TRUSTEE and BMO HARRIS BANK, N.A., | ) ) ) | |
| | ) | |
| Appellees. | ) | |

## __MEMORANDUM OPINION__

Scott G. Wilcox, MOORE AND RUTT, P.A., Wilmington, DE; Andrew S. Kent, CHIESA SHAHINIAN & GIANTOMASI P.C., West Orange, NJ – Attorneys for Appellant Insurance Company of the State of Pennsylvania.

Richard M. Beck, KLEHR HARRISON HARVEY BRANZBURG, LLP, Wilmington, DE; David T.B. Audley, Matthew T. Benz, CHAPMAN AND CUTLER LLP, Chicago, IL – Attorneys for Appellee BMO Harris Bank, N.A.

September 17, 2020
Wilmington, Delaware

*Maryellen Noreika*

**NOREIKA, U.S. District Judge**

Pending before the Court is an appeal by Insurance Company of the State of Pennsylvania ("ICSP") of the Bankruptcy Court's February 4, 2019 decision, *In re LTC Holdings*, 597 B.R. 565 (Bankr. D. Del. 2019) ("Opinion") and accompanying Order (Adv. D.I. 114)[1] ("Summary Judgment Order") entered in the chapter 7 cases of LTC Holdings, Inc. ("LTC Holdings") and subsidiaries LTCCORP Government Services-MI, Inc., f/k/a Lakeshore Engineering Services, Inc. ("LES") and LTCCORP Government Services-OH, Inc. f/k/a Toltest, Inc. ("Toltest," and together with LTC Holdings and LES, "the Debtors"). By the Summary Judgment Order, Chief Bankruptcy Judge Christopher S. Sontchi denied ICSP's summary judgment motion and granted a summary judgment motion filed by the Debtors' secured creditor BMO Harris Bank, N.A. ("BMO"). The Summary Judgment Order resolved a dispute over the Debtors' $5.5 million tax refund and awarded the tax refund to BMO based on (1) BMO's first priority security interest in the tax refund; and (2) a determination that the competing subrogation rights of appellant ICSP derived solely from the setoff rights of the United States, which had been previously released in a court-approved settlement between the United States and the Debtors. For the reasons set forth below, the Court will affirm the Summary Judgment Order.

---

[1] The docket of the adversary proceeding, captioned *Giuliano v. Insur. Co. of the State of Pennsylvania*, Adv. No. 15-51889 (CSS) (Bankr. D. Del.), is cited herein as "Adv. D.I.__." The docket of the Chapter 7 cases, captioned *In re LTC Holdings,* Case No. 14-11111 (CSS) (Bankr. D. Del.), is cited herein as "Bankr. D.I. __." The appendix (D.I. 14) filed in support of BMO's answering brief (D.I. 13) is cited herein as "BMO Appx. __."

## I.     <u>BACKGROUND</u>

### A.     **The Parties**

Prior to the chapter 7 filing, the Debtors provided general contracting services for large construction projects, both domestic and international, with a primary focus on constructing facilities for various branches of the United States military, with arms of the United States government acting as the owner/contracting party ("the United States Contracts").  (Adv. D.I. 20 (Counterclaim) ¶ 7).  For some of the United States Contracts, the Debtors were required to post performance and payment bonds, signed by a qualified surety, guaranteeing that the Debtors would perform their contracts with the United States and pay their subcontractors.  (*Id.*).  The Debtors obtained certain performance bonds and payment bonds from ICSP, as surety.  (*Id.* ¶ 8).  As the Bankruptcy Court noted, two of the United States Contracts on which ICSP acted as surety were the National Police Command Center ("NPCC") in Afghanistan and the Al Dhafra air base in the United Arab Emirates ("Al Dhafra").  *LTC Holdings*, 597 B.R. at 568-69.

Prior to the Petition Date, Appellee BMO extended credit to the Debtors, and the Debtors granted to BMO liens on and security interests in substantially all their personal property.  (Bankr. D.I. 110, ¶ 9).

### B.     **The Chapter 7 Cases and Claims**

On May 2, 2014 ("the Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, and a Chapter 7 Trustee ("Trustee") was appointed. The United States Department of Defense filed a proof of claim against the Debtors, and on May 24, 2016, amended its proof of claim ("the DOD Claim").  *LTC Holdings*, 597 B.R. at 570.  The DOD Claim included at least $68,040,956.58 in fixed, non-contingent, unbonded claims against Debtor LES and at least $893,110 in unbonded claims against the parent Debtor LTC Holdings

("the Unbonded DOD Claims").  *Id.*  The Unbonded DOD Claims against Debtor Toltest exceeded $15 million.  *Id.*  Claims contingent upon the completion of certain contracts by the Debtors' sureties, including ICSP, amounted to $84 million ("the DOD Bonded Claims").  *Id.*  The $84 million DOD Bonded Claims included $24,320,207.42 relating to the NPCC contract and $608,886.05 relating to the Al Dhafra contract.  *Id.*

On July 3, 2014, the Trustee filed a motion ("the MOU Motion") seeking entry of an order approving a Memorandum of Understanding ("the MOU") between the Trustee and BMO which contained a comprehensive settlement between the Trustee and BMO.  (Bankr. D.I. 110).  The Bankruptcy Court granted the MOU Motion by Order entered on September 8, 2014.  (Bankr. D.I. 196).  In the MOU, the Trustee acknowledged that BMO had a first priority security interest in the Tax Refund (as defined below).  (*Id.* at Ex. A, ¶ 1).

On August 8, 2014, BMO filed a proof of claim against each of the Debtors in the amount of no less than $39,153,909.92 ("the BMO Claim").  *See LTC Holdings*, 597 B.R. at 568.

### C.     The Tax Refund

Shortly before the Petition Date, the Debtors filed a consolidated tax return for tax year 2013, showing a net operating loss of $28 million for the 2013 tax year ("2013 NOL").  By separate application to the IRS ("the Tax Refund Application"), the Debtors sought to "carryback" the 2013 NOL to 2011 and obtain a refund of $5,628,542 in income taxes previously paid for tax year 2011 ("Tax Refund").  *LTC Holdings*, 597 B.R. at 569.  In response to the Tax Refund Application, the United States claimed setoffs against the Tax Refund based on damages that the United States asserted were due from the Debtors under certain United States Contracts.  The United States therefore placed an administrative hold on the Tax Refund.  *Id.* at 569-70.

### D.      Tax Refund Settlement and Order

The Trustee negotiated a settlement with the United States, memorialized in a stipulation dated January 12, 2016 between the Trustee and the United States (BMO Appx. Ex. 3, "the Tax Refund Stipulation"), under which (among other terms) the United States would release the Tax Refund to the Trustee in exchange for the Trustee releasing the Debtors' contract claims against the United States (referred to as "REAs" – Requests for Equitable Adjustment).  (BMO Appx. Ex. 3, ¶¶ G, H, 7).  In testimony given in support of the Tax Refund Settlement Motion (as defined below), the Trustee testified that the REAs being released had a face value of approximately $51 million.  (Bankr. D.I. 917, 6/9/2016 Hr'g Tr. at 109).  As part of the settlement, the Trustee also agreed to the allowance of the United States' amended proof of claim.  (BMO Appx. Ex. 3, ¶ 5).

Paragraph 4 of the Tax Refund Stipulation, representing the waiver by the United States of its setoff claims against the Tax Refund, states:

> 4. Except as provided by paragraph 5, effective as of the Effective Date and in consideration of the obligations under this Stipulation, the Contracting Activities shall be deemed to expressly waive any setoff rights arising out of the DOD Claim or the Government Contracts they may have or ever had pursuant to 11 U.S.C. § 553, and shall be estopped from claiming any such setoff rights it may have or ever had pursuant to 11 U.S.C. § 553, against any of the Debtors in the Tax Refund.  Nothing in this paragraph shall waive, estop, or otherwise limit any right of setoff by the Internal Revenue Service.

(BMO Appx. Ex. 3, ¶ 4).  Paragraph 10 of the Tax Refund Stipulation, representing the release by the United States of its claims against the Debtors, including its setoff claims against the Tax Refund, states:

> 10.   Except with respect to the obligations set forth herein, upon the Effective Date, the Contracting Activities hereby remise, release, discharge and acquit the Trustee and the Debtors' estates from any and all claims, action, liabilities, debts and causes of action whatsoever, however incurred or arising, now existing or hereafter arising, known or unknown, actually brought or that could have been brought relating or pertaining to the

> Government Contracts, the Government Projects, the Tax Refund, the
> Rocco Contract, and the Rocco Payment.  Nothing in this Agreement shall
> be construed to release or waive liability arising under federal tax, criminal,
> or environmental law or liability for fraud (including, but not limited to,
> securities and pension benefit fraud and claims arising under the False
> Claims, Act, 31 U.S.C. § 3729, et seq.).  The Contracting Activities waive
> any right that they, or the assigns and successors, may have to file a proof
> of claim under Section 502(h) of the Bankruptcy Code, or otherwise receive
> payment from the Debtors' estates.  Except as limited by the preceding
> sentence, nothing in this paragraph affects or limits a distribution to the
> United States by the Trustee on account of the Allowed DOD Claim.

(BMO Appx. Ex. 3, ¶10).

On January 14, 2016, the Trustee filed a motion seeking approval of the Tax Refund Stipulation pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("the Tax Refund Settlement Motion").  (Bankr. D.I. 662; Adv. D.I. 20 ¶ 22).  On February 11, 2016, ICSP filed a limited objection to the Tax Refund Settlement Motion ("the ICSP Objection").  (Bankr. D.I. 681).  The Bankruptcy Court held an initial hearing on the Tax Refund Settlement Motion on March 7, 2016.  (Bankr. D.I. 766).  Following the initial hearing, the Trustee and ICSP reached an agreement on proposed language approving the Tax Refund Settlement Motion.  The agreement on proposed language was reported to the Bankruptcy Court at the next hearing on June 9, 2016, and, in light of that agreement, ICSP withdrew the ICSP Objection.  (Bankr. D.I. 917, 6/9/2016 Hr'g Tr. at 5-6).  On June 28, 2016, following closing arguments, the Bankruptcy Court entered an Order approving the Tax Refund Stipulation (BMO Appx. Ex. 4) ("Tax Refund Settlement Order").

Paragraph 3 of the Tax Refund Settlement Order states:

> 3.   Except as provided in paragraph 5, nothing in this Order or the
> Stipulation shall waive, estop, or otherwise limit the rights of any party
> claiming an interest in the Tax Refund, including but not limited to, the
> estate, the Insurance Company of the State of Pennsylvania, BMO Harris
> Bank N.A., or any other party claiming an interest in the Tax Refund, and
> the parties reserve any and all rights and arguments they had regarding the

5

ownership of, or their interest in Tax Refund [sic] prior to the entry of this
Order.

(BMO Appx. Ex. 4, ¶ 3).  Paragraph 5 of the Tax Refund Settlement Order states

> 5. Upon receipt of the Tax Refund, the Trustee shall hold the funds in
> escrow and shall make no distribution pending further Order of the Court,
> except that the Trustee may upon application to, and approval by the Court,
> (1) pay the Trustee's reasonable professional fees and commission under
> 11 U.S.C. § 326 incurred specifically in connection with the recovery of the
> Tax Refund, including the 9019 motion, and (2) pay to the estates 10% of
> the Tax Refund, net of the expenses paid in subparagraph (1) of this
> paragraph.

(*Id.*, ¶ 5).  In the Tax Refund Settlement Order, the DOD Claim was allowed in the amount of

$170,668,300.33 – the sum of the DOD Bonded Claims plus the Unbonded DOD Claims.  (BMO

Appx. Ex. 4, ¶ 7; BMO Appx. Ex. 5, Summary ¶ 3).  ICSP did not object to the allowance of the

DOD Claim.

After the Tax Refund Settlement Order was entered, the Trustee received checks totaling

$5,420,797.77 from the IRS, and such funds (the Tax Refund, as defined above) are presently

being held by the Trustee pursuant to the Tax Refund Settlement Order.  (BMO Appx. Ex. 7).

Likewise, the Trustee dismissed with prejudice the Debtors' REA claims against the United States

pursuant to paragraph 7 of the Tax Refund Stipulation.  (BMO Appx. Ex. 8).

### E.  The Adversary Proceedings

On November 6, 2015, the Trustee commenced an adversary proceeding by filing a

complaint against ICSP.  (Adv. D.I. 1).  The complaint alleged claims against ICSP for avoidance

of preferential and fraudulent transfers.  On July 7, 2016, the Trustee filed an amended complaint

(Adv. D.I. 18) ("Amended Complaint").

On July 29, 2016, the Trustee commenced a second adversary proceeding against ICSP,

seeking a declaratory judgment that the Debtors' estates, not ICSP, were entitled to the Tax

Refund.  (Adv. Proc. 16-51036, D.I. 1).  On September 8, 2016, ICSP filed its answer to the amended complaint (Adv. 16-51036, D.I. 3) ("Answer").

ICSP filed its answer to the Amended Complaint in the first adversary proceeding.  (Adv. D.I. 20).  With its answer, ICSP filed a counterclaim against the Trustee, and joined BMO as an additional counterclaim defendant.  In its counterclaim, ICSP sought a declaratory judgment that ICSP, not the Debtors' estates or BMO, was entitled to the Tax Refund  (Adv. D.I. 20) ("Tax Refund Counterclaim").

The two adversary proceedings were consolidated for all pretrial and trial purposes.  (Adv. D.I. 37).

### F.    Summary Judgment Motions and Order

After discovery, on December 28, 2017, ICSP moved for summary judgment (Adv. D.I. 79, 80) ("ICSP Summary Judgment Motion").  (*See* D.I. 10 at 14).  The ICSP Summary Judgment Motion asked the Bankruptcy Court to grant partial summary judgment and award the Tax Refund to ICSP pursuant to principles of equitable subrogation.  ICSP attached exhibits intended to satisfy the "mutuality" requirement of setoff by establishing that (i) the Tax Refund related to $5,628,830 in corporate income taxes paid solely by LTC Holdings from its own funds (as opposed to funds belonging to any of the other Debtors), and (ii) ICSP, as subrogee of the United States, was entitled to setoff ICSP's losses from LTC Holdings' breach of the NPCC Contract against the escrowed Tax Refund.  On December 29, 2017, BMO filed its own summary judgment motion (Adv. D.I 82, 83) ("BMO Summary Judgment Motion"), requesting that the Bankruptcy Court grant partial summary judgment in its favor on Count I of the Counterclaim filed by ICSP and award the Tax Refund to BMO.

On February 4, 2019, the Bankruptcy Court issued the Opinion and Summary Judgment Order. The Bankruptcy Court denied ICSP Summary Judgment Motion based on its conclusion that ICSP's argument, which depended on the asserted premise that Debtor LTC Holdings "owned" the Tax Refund because LTC Holdings purportedly made the tax payments which gave rise to the Tax Refund, presented disputed issues of material fact. *LTC Holdings*, 597 B.R. at 570. After evaluating Appellant ICSP's arguments, as well as Appellee's BMO's competing arguments that the payments were actually made by or on behalf of Debtor LES, Bankruptcy Judge Sontchi stated, "To make a long story short, the issue of whose money was used for the tax payment is fraught with minutia, complexity, and ambiguity." *Id.*

The Bankruptcy Court found no similar obstacles with respect to the BMO Summary Judgment Motion. The facts were undisputed that, at the time the Tax Refund Settlement Order was entered, the United States had unsatisfied claims resulting from the NPCC and Al Dhafra contracts because ICSP had not completed its work on those contracts under its performance bonds. *Id.* at 571. In entering judgment in favor of BMO, the Bankruptcy Court concluded that because the United States retained those claims, and because § 509 of the Bankruptcy Code subordinated ICSP's derivative subrogation claims until the United States was paid in full, the United States was entitled to release and did release its claims in the Tax Refund Stipulation. Once the claims of the United States were released, Appellant ICSP's derivative subrogation claims – the only basis for asserting an interest in the Tax Refund – were extinguished. *Id.* at 573-78.

### G. The Appeal

On February 14, 2019, ICSP appealed the Summary Judgment Order. (D.I. 1). The merits of the appeal are fully briefed. (D.I. 10, 13, 16). The Court did not hear oral argument because

the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.    JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1).  Following the Bankruptcy Court's entry of the Summary Judgment Order, the remaining claims in the adversary proceeding were resolved by a settlement approved by the Bankruptcy Court.  (Bankr. D.I. 1290).  Accordingly, the Summary Judgment Order is a final, appealable order.

The Bankruptcy Court's legal conclusions are reviewed *de novo*, its factual findings for clear error, and its exercises of discretion for abuse.  *See In re Michael*, 699 F.3d 305, 308 n.2 (3d Cir. 2012).  A district court's review of a bankruptcy court order granting summary judgment is plenary.  *Rosen v. Bezner*, 996 F.2d 1527, 1530 (3rd. Cir. 1993); *In re AE Liquidation, Inc.*, 556 B.R. 609, 617 (D. Del. 2016).  The parties agree that plenary review applies.  (D.I. 10 at 4; D.I. 13 at 1).  Under that standard, the district court looks to whether the record demonstrates a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law.  *AE Liquidation*, 556 B.R. at 617.

## III.    DISCUSSION

### A.    Equitable Subrogation and 11 U.S.C. § 509

A suretyship is the result of a three-party agreement, whereby one party, the surety, becomes liable for the obligor's debt or duty to the third-party obligee.  *Hartford Fire Insurance Company v. United States*, 108 Fed. Cl. 525, 531 (Fed. Cl. 2012); *United States Sur. Co. v. United States,* 83 Fed. Cl. 306, 310 (2008).  In this case, for the NPCC and Al Dhafra contracts, ICSP was the surety, the Debtors were the obligors, and the United States government was the obligee.

Under a performance bond, a surety guarantees that the project will be completed if a contractor defaults. *Dependable Ins. Co., Inc. v. United States*, 846 F.2d 65, 66 (Fed. Cir. 1988). "A performance bond surety may discharge its obligation to the Government on a defaulted contract either by taking over and completing performance of the contract or, if it lets the Government re-procure the contract, by assuming liability for the costs of completion that exceed the original contract price." *Hartford*, 108 Fed. Cl. at 531 (citing *Westchester Fire Ins. Co. v. U.S.*, 52 Fed. Cl. 567, 574 (Fed. Cl. 2002)). In this case, for the NPCC and Al Dhafra contracts, ICSP issued performance bonds in favor of the United States, and took over construction once the Debtors stopped their work on the contracts.

"[A] surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *See e.g., Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137 (1962). A surety fulfilling an obligation under a performance bond succeeds through equitable subrogation to the contractual rights of both the defaulted contractor and the government itself. *Id.* The surety is "entitled to the funds in the hands of the government not as a creditor subject to set-off, but as a subrogee having the same right to the funds as the government." *Hartford*, 108 Fed. Cl. at 532. The rights of the government include the right of setoff. *See, e.g., United States v. Munsey Trust Co. of Washington, D.C.*, 332 U.S. 234, 239 (1947) ("The government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him."). In this case, ICSP argues that pursuant to these principles, it possessed the same rights of setoff against the Tax Refund as the United States.

As BMO points out, there are limitations on the equitable subrogation rights of a performance bond surety. First, a surety cannot, by way of subrogation, assert any greater rights than the creditor in whose shoes it is substituted. *Western Casualty and Surety Co. v. Brooks (In*

10

*re Bruns Coal Co.)*, 362 F.2d 486, 491 (4th Cir. 1966); *In re James R. Corbitt Co.*, 62 B.R. 1017, 1022 (Bankr. E.D. Va. 1986).  The equitable subrogation rights of a performance bond surety are "purely derivative." *Aviation & General Insurance Co., Ltd. v. United States*, 882 F.3d 1088, 1102 (D.C. Cir. 2018).  That is to say, the "subrogee takes no more rights than its subrogor had." *United States v. California*, 507 U.S. 746, 747 (1993); *Lyndon Property Ins. Co. v. Duke Levy and Assocs., LLC*, 475 F.3d 268, 271 (5th Cir. 2007).  The subrogee (here, ICSP), who has all the rights of the subrogor (here, the United States), "cannot acquire by subrogation what another whose rights he claims did not have." *United States v. California*, 507 U.S. at 747.  The second limitation is that a surety has no rights of equitable subrogation until it completes its performance obligations under the performance bond.  *Colonial Surety Co. v. United States*, 108 Fed. Cl. 622, 638 (2013) (confirming that in order for a surety's right to equitable subrogation to attach under its performance bond, it must prove that it discharged its obligations thereunder); also see Rest. (3d) of Suretyship and Guaranty § 27(1) ("Upon total satisfaction of the underlying obligation, the secondary obligor is subrogated to all rights of the obligee with respect to the underlying obligation . . ."); *Nobel Ins. Co. v. City of New York*, 2006 WL 2848121 (S.D.N.Y. 2006).  The requirement that a surety must complete performance prior to standing in the shoes of a creditor is designed to prevent a situation where the surety, prior to completing performance, could impair the rights of the creditor in pursuing the debtor or asserting its rights against the debtor's assets/collateral.  *See Pennsylvania Nat. Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 951 (8th Cir. 2004); Rest. (3d) of Suretyship and Guaranty § 27, comment b.

The Bankruptcy Court determined that § 509 of the Bankruptcy Code, not common law principles of equitable subrogation, applied to the issues in this case. *LTC Holdings*, 597 B.R. at

574.  ICSP does not challenge this aspect of the Bankruptcy Court's ruling on appeal.  Section 509

of the Bankruptcy Code provides as follows:

> (a)    Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.
>
> (b)    Such entity is not subrogated to the rights of such creditor to the extent that—
>
> (1)    a claim of such entity for reimbursement or contribution on account of such payment of such creditor's claim is—
>
> (A)    allowed under section 502 of this title;
>
> (B)    disallowed other than under section 502(e) of this title; or
>
> (C)    subordinated under section 510 of this title; or
>
> (2)    as between the debtor and such entity, such entity received the consideration for the claim held by such creditor.
>
> (c)    ***The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.***

11 U.S.C. § 509 (emphasis added).  As the Bankruptcy Court noted, § 509(a) recognizes that a

surety may obtain subrogation rights before it fully performs its surety obligations, to the extent

of payments made by the surety.  *LTC Holdings*, 597 B.R. at 574.  Section 509(a), however, like

common law principles of equitable subrogation, is also limited.  Section 509(a) is expressly made

subject to § 509(b) and (c) ("[e]xcept as provided in subsection (b) or (c) of this section"), both of

which, to the extent applicable in any given case, condition the subrogation rights granted by

§ 509(a).  Thus, if a surety does possess partial subrogation rights, § 509(c) subordinates those

rights until such time as the primary creditor (here, the United States) is paid in full on the claim

which the surety (ICSP) has undertaken to pay.  The legislative history of § 509(c) confirms that

a surety's subrogation claim is subordinated until such time as the surety fully satisfies the obligations it owes to the primary creditor:

> It is desirable to preserve present law to the extent that a surety or codebtor is not permitted to compete with the creditor he has assured until the assured party's claim has paid in full. Accordingly, section 509(c) of the House amendment subordinates both a claim by way of subrogation or a claim for reimbursement or contribution of a surety or codebtor to the claim of the assured party until the assured party's claim is paid in full.

124 Cong. Rec. H. 11,094 (Sept. 28, 1978), S. 17,410–11 (Oct. 6, 1978).

### B. The Bankruptcy Court Correctly Concluded that ICSP's Equitable Subrogation Claims Were Extinguished Upon Waiver and Release by the United States

ICSP does not challenge the Bankruptcy Court's conclusion that under § 509 "partial subrogation is possible, but subordinated until the obligee is paid in full." *LTC Holdings*, 597 B.R. at 574. ICSP also does not challenge the Bankruptcy Court's observation that, on the date the Tax Refund Settlement Order was entered, ICSP had not yet completed its surety payments on the NPCC Al Dhafra contracts.

Here, the Tax Refund Stipulation approved the release and waiver by the United States of its setoff claims against the Tax Refund. The Bankruptcy Court found that under § 509(c), the United States was permitted to release and waive its setoff claims on the day that the Tax Refund Settlement Order was entered because, on that day, ICSP had not completed its surety payments on the NPCC and Al Dhafra contracts, and therefore ICSP's equitable subrogation claims remained subordinated. ICSP made payment to the NPCC and Al Dhafra contracts *after* the Tax Refund Settlement Order was entered on June 28, 2016 including: $2,083,562.86, consisting of three payments on the NPCC contract, and $397,132.99 consisting of two payments on the Al Dhafra contract. *LTC Holdings*, 597 B.R. at 571. Because ICSP's equitable subrogation rights to the Tax Refund derived solely from the setoff rights of the United States, ICSP's equitable subrogation

claims were extinguished as a matter of law when they were waived and released by the United States. *LTC Holdings,* 597 B.R. at 578.

ICSP disagrees with this outcome and raises several issues on appeal. First, ICSP argues that the reservation of rights language added to the Tax Refund Settlement Order requires reversal of the Summary Judgment Order. (*See* D.I. 10 at 18-21). According to ICSP, "the Stipulation was made subject to, and qualified by the negotiated and unambiguous terms of the [Tax Refund Settlement] Order," which provided that "nothing in this Order or the Stipulation shall waive, estop, or otherwise limit the right of any party claiming an interest in the Tax Refund." Thus, according to ICSP, the Bankruptcy Court's holding is precluded by the plain terms of the Tax Refund Settlement Order. (*Id.* at 18). Second, ICSP argues that the Bankruptcy Court misapplied § 509 of the Bankruptcy Code, and that the Second Circuit's decision *in In re Chateaugay Corp.*, 94 F.3d 772 (2d Cir. 1996) supports ICSP's argument that its subrogation claims were not subordinated when the Tax Refund Settlement Order was entered, as the United States was then effectively "paid in full." (*See id.* at. 21-26). Finally, ICSP argues that the Bankruptcy Court improperly declined to make factual findings based on uncontested evidence that the Tax Refund related to amounts paid exclusively by LTC Holdings from its own funds, and that the ICSP Summary Judgment Motion should have been granted. (*See id.* at 27-30).

### 1.    The Reservation of Rights Does Not Require Reversal

ICSP initially objected to the Tax Refund Settlement Motion. ICSP could have pressed its objection and/or filed an adversary proceeding, if necessary, to prevent the Tax Refund Stipulation from being approved in the first instance. ICSP did not, and instead agreed that certain reservation of rights language added to the Tax Refund Settlement Order would resolve its limited objection:

> 3.   Except as provided in paragraph 5, ***nothing in this Order or the Stipulation shall waive, estop, or otherwise limit the rights of any party***

> ***claiming an interest in the Tax Refund***, including but not limited to, the
> estate, the Insurance Company of the State of Pennsylvania, BMO Harris
> Bank N.A., or any other party claiming an interest in the Tax Refund, ***and
> the parties reserve any and all rights and arguments they had regarding
> the ownership of, or their interest in Tax Refund*** [sic] prior to the entry of
> this Order.

(BMO Appx. Ex. 4, ¶ 3) (emphasis added) ("Reservation of Rights").  ICSP argues on appeal that

the Reservation of Rights reflects a negotiated compromise by which the parties agreed that

nothing in the Tax Refund Settlement Order would waive or limit ICSP's right to step into the

shows of the bond obligee – the United States.  (D.I. 10 at 21 n.28).  According to ICSP, the

Reservation of Rights preserved its subrogation claim in the Tax Refund and compels the reversal

of the Summary Judgment Order.  (D.I. 10 at 19).

BMO disagrees that the language contained in the Reservation of Rights supports ICSP's

interpretation.  BMO argues that the comprehensive release of setoff rights against the Tax Refund

given by the United States in the Tax Refund Stipulation – which release was consummated by the

parties after the Bankruptcy Court entered the Tax Refund Settlement Order – had the legal effect

of extinguishing ICSP's purely derivative equitable subrogation claims to the Tax Refund,

notwithstanding the Reservation of Rights.  (D.I. 13 at 23).  BMO argues that the principal features

of the Tax Refund Stipulation were (1) an unconditional release by the Debtors of their REA

contract claims against the United States, and allowance of the DOD Claim, in exchange for (2) an

unconditional release and waiver by the United States of its setoff rights against the Tax Refund.

(*See id.* at 24).  According to BMO, the Trustee would not have released the estates' REA claims

against the United States, or agreed to the allowance of the DOD Claim, in the absence of the

setoff release; likewise, absent the Tax Refund Stipulation, the United States would have sought

to set off the Tax Refund, potentially resulting in no benefit to the Debtors' estates.  (D.I. 13 at 23-

24).  BMO asserts that although ICSP made a strategic decision that this Reservation of Rights

was sufficient to resolve its Limited Objection, and took the risk that its equitable subrogation arguments would survive entry of the Tax Refund Settlement Order, that language does not support ICSP's interpretation.

The Court agrees with BMO. The Reservation of Rights did not guarantee or preserve ICSP's subrogation rights because it did not stop the Tax Refund Stipulation from being consummated – indeed, the Bankruptcy Court's entry of the Tax Refund Settlement Order accomplished just the opposite result. The approved Tax Refund Stipulation has been consummated, as: (1) the setoff release took effect – evidenced by the payment of the Tax Refund to the Trustee (to be held in escrow) (BMO Appx. Ex. 7); (2) the Debtors dismissed their litigation claims against the United States with prejudice (BMO Appx. Ex. 8); and (3) the Tax Refund Settlement Order allowed the DOD Claim in the amount of $170,668,300.33 (BMO Appx. Ex. 4, ¶ 7). The Reservation of Rights had the effect of "reserv[ing] any and all rights and arguments [ICSP] had" – if any – "regarding the ownership of, or [its] interest in [the] Tax Refund prior to the entry of this Order." Contrary to ICSP's "gotcha" argument, the Reservation of Rights did not acknowledge or preserve ICSP's subrogation rights. When the Tax Refund Stipulation was consummated, ICSP's derivative setoff rights were extinguished because the United States released its setoff rights.

A reservation of rights does not preserve or revitalize rights that are illusory. *In re Lehman Brothers Holdings Inc*., 2013 WL 5908057, *8 at n.8 (Bankr. S.D.N.Y. 2013). A reservation of rights does not create rights where none existed. *In re The 1031 Tax Group, LLC,* 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008). Here, the Reservation of Rights did not elevate ICSP's equitable subrogation rights beyond their derivative nature. Nor did the Reservation of Rights change the unconditional nature of the United States' release in the Tax Refund Stipulation, or somehow carve

out ICSP's equitable subrogation claims from the release itself.  The record reflects that none of BMO, the Trustee, the United States, or the Bankruptcy Court blessed or conceded ICSP's equitable subrogation arguments.  Indeed, the only way the Bankruptcy Court could have ensured that ICSP suffered no diminution in its equitable subrogation rights would have been to deny approval of the Tax Refund Stipulation altogether.

ICSP's interpretation of the Tax Refund Settlement Order is unsupported by the language of the Reservation of Rights.  ICSP argues:

> In the Opinion, . . . the Bankruptcy Court suggested that a surety cannot "step into the shoes" of a bond obligee (the United States) when it is "still wearing them."  That is not what occurred here.  Rather, the United States removed its "shoes" as part of a negotiated compromise, deposited those "shoes" in escrow, and unambiguously agreed that "nothing" in the United States' agreement shall "waive" or "limit" ICSP's right to step into those "shoes."

(D.I. 10 at 21, n.28).  The Reservation of Rights does not support an interpretation that the settlement approved by the Tax Refund Settlement Order was somehow placed into escrow, pending the outcome of the dispute.  Once the Tax Refund Settlement Order was entered, the Trustee and the United States consummated the settlement.  The United States' release of its setoff rights against the Tax Refund became effective.  As BMO argues, the United States not only "removed its shoes" (the setoff rights against the Tax Refund), but also relinquished them entirely, and ICSP thereafter had no "shoes to step into."  The Tax Refund Settlement Order, a final order, was not somehow "held open" by the Reservation of Rights.

ICSP cites the transcript of the 9019 hearings extensively and specifically references comments made by counsel for the United States at the June 9, 2016 hearing on the Tax Refund Settlement Motion, in which counsel said that it was not his intention to cut off ICSP's equitable subrogation rights, *if any*.  (D.I. 10 at 11) (emphasis in original).  Counsel also stated that the

United States was "indifferent" as to which of BMO or ICSP had rights in the Tax Refund.  As ICSP itself recounts, counsel for the United States stated:

> So if a surety has some theory of subrogation that they can reach some portion or all of that refund, that's great.  If they can't, that's the way it goes.  If the secured creditor has those rights, that's fine too.  But this is, the point is, is that the ownership of the refund is not before the Court today.

(D.I. 10 at 11 (quoting Bankr. D.I. 84-4, 3/7/2016 Hr'g Tr. at 22:11-23:24).  Nothing in these comments represented a guaranty to ICSP by the United States that ICSP's equitable subrogation rights would be legally unimpaired by the approval and consummation of the Tax Refund Stipulation.

Finally, the Court agrees with BMO that ICSP's citations to *In re Molycorp, Inc.*, 562 B.R. 67 (Bankr. D. Del. 2017) and *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) (D.I. 10 at 19-20) are inapposite here.  ICSP argues that "it is black-letter law that an unambiguous private contract's terms must be enforced irrespective of the parties' subjective intent," *Travelers*, 557 U.S. at 150; and that "a provision in a [court order] is ambiguous only when, from an objective standpoint, it is reasonably susceptible to at least two different interpretations," *Molycorp*, 562 B.R. at 79.  (D.I. 10 at 18-19).  BMO, however, does not take the position that the Reservation of Rights is ambiguous.  (D.I. 13 at 29).  The Reservation of Rights ensured that ICSP "reserve[d] any and all rights and arguments they had regarding the ownership of, or their interest in [the] Tax Refund prior to the entry of [the Tax Refund Settlement Order]."  (Appendix Ex. 4, ¶ 3).  Thus, the Tax Refund Settlement Order made no findings regarding which of the Debtors owned the Tax Refund.  Along the same lines, ICSP argues that the Bankruptcy Court's decision on the legal effect of the Reservation of Rights language rendered it meaningless.  (*See* D.I. 10 at 19 ("The provisions in Paragraph 3 of the Tax Escrow Order stating that 'nothing' in the 'Stipulation' shall 'waive, estop, or otherwise limit' ICSP's claimed interest in the Tax Refund are not reasonably

susceptible to an interpretation that <u>something</u> in the Stipulation <u>did</u> waive, estop, and otherwise limit ICSP's subrogation rights in the Tax Refund.  That is the opposite of what the [Tax Refund Settlement] Order provides") (emphasis in original)).  BMO has not attempted, however, to preclude ICSP from arguing "the ownership of, or their interest in [the] Tax Refund" on the basis of waiver or estoppel.  BMO has not asserted that it was any waiver or estoppel by ICSP that dictates the result here; rather, it was the waiver and release by the United States of its setoff rights against the Tax Refund.

## 2. The *Chateaugay* Decision Does Not Require Reversal

ICSP argues that the Second Circuit's decision in *In re Chateaugay Corp.*, 94 F.3d 772 (2d Cir. 1996) supports its argument that its subrogation claims were not subordinated when the Tax Refund Settlement Order was entered – because, ICSP argues, the United States was then effectively "paid in full."  (D.I. 10 at 23-24).

*Chateaugay* does not compel a different result.  In *Chateaugay*, a statute required the debtor, LTV Steel ("LTV") to pay black lung benefits on behalf its employees.  *Id*. at 773.  To secure the LTV's obligations partially, Aetna issued a surety bond for $5.5 million in favor of the Department of Labor ("DOL").  *Id*. at 774.  As it approached bankruptcy, LTV ceased making the black lung benefit payments to the DOL.  Thereupon, Aetna paid out the full amount of its $5.5 million bond.  *Id*.  In LTV's bankruptcy case, the DOL filed a claim against LTV for black lung benefits which had not been satisfied by Aetna's bond.  *Id*.  Thereafter, pursuant to a court approved settlement, LTV and the DOL reached a settlement pursuant to which the DOL's claim for unpaid black lung benefit payments was reduced to $23.6 million and repaid.  *Id*.

Unrelated to the DOL settlement, LTV was separately at odds with the IRS about excise taxes which the IRS claimed that LTV owed.  *Id*. at 775, n.1.  LTV and the IRS resolved the dispute

in a second court-approved settlement which provided for a $3.6 million payment by LTV to the IRS. *Id*. at 775. This sum represented a cash payment of $5.5 million to satisfy LTV's excise tax liability, increased by approximately $3.4 million in other taxes asserted against various related debtors in the bankruptcy proceedings, and reduced by a tax refund – on unrelated tax overpayments – of nearly $5.3 million. *Id*.

Aetna claimed an interest in $4.2 million of the tax refund, by virtue of its payments under its surety bond. *Id*. at 775, n.2. Aetna objected to the use of $4.2 million of the tax refund as part of the IRS settlement on the grounds that such use would impair Aetna's equitable subrogation rights. *Id*. at 775. LTV opposed Aetna's equitable subrogation rights under § 509(c) of the Bankruptcy Code on the basis that Aetna's claim was subordinated to the claim of the DOL, because the DOL had not been paid in full. *Id*. at 779.

The Second Circuit found that where a subrogor, such as the DOL, settles its claim for less than the face amount (as the DOL had done in that case), the claim should be treated as fully paid for purposes of § 509(c). *Id*. at 780. Because the DOL claim was treated as fully paid by virtue of the settlement, the Second Circuit held that under § 509(c), Aetna's equitable subrogation claim was no longer subordinated. *Id*. ICSP argues that *Chateaugay* is applicable to the facts of this case. The Court disagrees.

First, ICSP's recitation of the facts in *Chateaugay* is inaccurate. ICSP states: "There, as here, the debtor entered into a settlement with the United States which ultimately had the effect of the United States relinquishing its setoff rights in a future refund of prepetition tax payments." (D.I. 10 at 23). To the contrary, the DOL's settlement with the United States in *Chateaugay* did not involve the DOL waiving its setoff rights. The Second Circuit found that the DOL had not waived its setoff rights (because of its failure to include the setoff rights in its proof of claim).

*Chateaugay*, 94 F.3d at 776.  Because there was not a setoff release in the underlying settlement in *Chateaugay*, ICSP's reliance on that case is misplaced.  Moreover, as BMO points out, Aetna had fully paid on its surety bond in *Chateaugay,* and this alone dictated that its equitable subrogation claims would not be subordinated.  Unlike *Chateaugay*, ICSP had not fully performed on its NPCC and Al Dhafra performance bonds when the Tax Refund Settlement Order was entered.  There is no question in this case that, as of the date the Tax Refund Settlement Order was approved, ICSP's equitable subrogation claims were subordinated to the claims of the United States.[2]

*Chateaugay* is further distinguishable.  In *Chateaugay*, a chapter 11 reorganization, DOL agreed to accept less than it was owed for the certainty of some lesser payment.  In this case, a chapter 7 liquidation, the United States did not compromise its claim.  It did not receive certainty of payment, as did the DOL.  Here, the claim of the United States, including the DOD Bonded Claim, was allowed in full, and the United States awaits whatever *de minimis* distribution will be made by the Trustee.  Thus, unlike in *Chateaugay*, where the subrogor received a cash settlement which reduced its claim to zero, the principal consideration for the United States in the Tax Refund Stipulation was dismissal of the Debtors' REA claims.  Thus, the nature of the DOL's settlement with debtor LTV in *Chateaugay* differs in material respects from the United States' settlement

---

[2]    ICSP further asserts that the United States had only a debt in the amount of $893,110 to assert as a setoff against the Tax Refund.  (D.I 10 at. 25).  As BMO points out, however, this argument assumes that Debtor LTC Holdings owned the Tax Refund ("there was no evidence of any actual debt that the United States could have set off against LTC Holdings' Tax Refund, beyond a $893,110 item").  The Bankruptcy Court expressly declined to determine which of the Debtors owned the Tax Refund.  If one of the other Debtors owned the Tax Refund – LES, for example, whose income and net operating losses were alone responsible for the Tax Refund – the amount of the claim the United States could have asserted against that Debtor to support a setoff of the Tax Refund would be entirely different; the allowed DOD Claim included at least $68,040,956.58 in fixed, non-contingent, unbonded claims against Debtor LES.

with the Debtors in this case.  *Chateaugay* does not alter the conclusion in this case that when the Tax Refund Settlement Order was entered, ICSP's equitable subrogation rights were subordinated to the claims of the United States.

### 3.  ICSP's Remaining Argument Is Moot

ICSP argues that the Bankruptcy Court's decision to deny the ICSP Summary Judgment Motion must be reversed because the Bankruptcy Court "declined to make any findings of fact as to which company or companies among the various Debtors paid the subject taxes." (D.I. 10 at 17, 27). The ICSP Summary Judgment Motion, which asked the Bankruptcy Court to award the Tax Refund to ICSP pursuant to principles of equitable subrogation, attached exhibits, including LTC Holdings' internal accounting, ledger, tax returns, written account transcripts from the IRS, and the Debtors' 2011 audited financial statement for the period of time at issue. (*See id.*). This evidence was intended to satisfy the "mutuality" requirement of setoff by establishing that (i) the Tax Refund related to $5,628,830 in corporate income taxes paid solely by LTC Holdings from its own funds (as opposed to funds belonging to any of the other Debtors), and (ii) ICSP, as subrogee of the United States, was entitled to setoff ICSP's losses from LTC Holding's breach of the NPCC Contract against the escrowed Tax Refund.  BMO objected to these records initially, but subsequently withdrew its objections, except as to two accounting ledgers, which objections the Bankruptcy Court subsequently overruled.

ICSP argues that the undisputed documentary record established, among other things, that: the subject tax payments for 2011 were paid from LTC Holdings' bank account; the pre-petition Debtors' audited financial statement for 2011 reflected that LTC Holdings, solely, paid federal income taxes in 2011 and recorded all 2011 income tax payments as debts against LTC Holdings' own earnings; and that LES and Toltest recorded no income tax payments in 2011.  According to

22

ICSP, BMO submitted no exhibits to controvert the documentary record, and submitted only a declaration from Jeffrey Miller, the Debtors' former CFO, which was merely intended to raise a question of fact regarding the purpose or ownership of $2,000,000 transferred or repaid from LES's bank account to LTC Holdings' bank account.  ICSP argues that the Bankruptcy Court improperly declined to make express findings of fact regarding the source and ownership of LTC Holdings' tax payments, stating only that "the issue of whose money was used for the tax payment is fraught with minutia, complexity, and ambiguity.  Regardless of who receives the benefit of the doubt, no reasonable fact-finder could be certain who paid." *LTC Holdings*, 597 B.R. at 570.  ICSP argues on appeal that the evidentiary issue on this issue is one-sided and presumptively establishes that LTC Holdings paid the subject taxes.  (D.I. 16 at 4).  In light of the uncontroverted documentary record, ICSP asserts that the Bankruptcy Court erred in failing to find as a matter of fact that the Tax Refund related to amounts paid exclusively by LTC Holdings from its own funds.

Conversely, BMO argues that the Bankruptcy Court's conclusion that ICSP's equitable subrogation rights were subordinated when the Tax Refund Settlement Order was entered, and extinguished by the United States' waiver of its setoff rights against the Tax Refund, disposed of the adversary proceeding, and mooted the issues raised in the ICSP Summary Judgment Motion regarding which Debtor owned the Tax Refund.  BMO further argues that even if this Court were to review ICSP's argument, the Bankruptcy Court's conclusion that material disputed facts prevent summary judgment in ICSP's favor must be affirmed.

The Court agrees with BMO.  Because the Court affirms the Bankruptcy Court's conclusion that ICSP's equitable subrogation rights were subordinated when the Tax Refund Settlement Order was entered, and were extinguished by the United States' waiver of its setoff rights against the Tax Refund, ICSP's final argument remains moot.

**IV.**     <u>**CONCLUSION**</u>

Accordingly, the Summary Judgment Order (Adv. D.I. 114) shall be affirmed.  A separate

Order shall be entered.